1  Mark E. Merin (State Bar No. 043849)
   Paul H. Masuhara (State Bar No. 289805)
2  LAW OFFICE OF MARK E. MERIN
   1010 F Street, Suite 300
3  Sacramento, California 95814
   Telephone:  (916) 443-6911
4  Facsimile:  (916) 447-8336
   E-Mail:      mark@markmerin.com
5                paul@markmerin.com
6
7  Attorneys for Plaintiffs
   RONNIE L. MOODY, GARY T. DEANS,
8  BILLY R. WILLIAMS, and DONNEL E. JONES
9
10              UNITED STATES DISTRICT COURT
11            SOUTHERN DISTRICT OF CALIFORNIA
12
13  RONNIE L. MOODY, et al.,          Case No. 3:18-cv-01110-WQH-AGS
14              Plaintiffs,            **DECLARATION OF**
15  vs.                               **MARK E. MERIN**
16  CALIFORNIA DEPARTMENT OF
    CORRECTIONS AND REHABILITATION,
17  et al.,
18              Defendants.
19

20      I, Mark E. Merin, do declare and say:

21      1.    I am an attorney licensed to practice in the State of California and admitted

22  to practice before the United States District Court for the Southern District of California.

23  My firm represents Plaintiffs Ronnie L. Moody, Gary T. Deans, Billy R. Williams, and

24  Donnel E. Jones. I submit this declaration in support of Plaintiffs' opposition to the

25  pending motion for summary judgment (ECF Nos. 56 [MSJ]).

26      2.    A true and correct copy of excerpts from the deposition of Gary T. Deans,

27  taken in this matter on May 29, 2019, is attached as "Exhibit A" [Deans Depo.].

28      3.    A true and correct copy of excerpts from the deposition of Donnel E. Jones,

taken in this matter on June 10, 2019, is attached as "Exhibit B" [Jones Depo.].

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct and that this declaration was executed on April 6, 2020, at Sacramento, California.

_____

Mark E. Merin

**DECLARATION OF MARK E. MERIN**
*Moody v. Cal. Dept' of Corr. & Rehab.*, U.S. District Court, S.D. Cal., Case No. 3:18-cv-01110-WQH-AGS

# EXHIBIT A

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4   RONNIE L. MOODY, et al,    )

                               )

5         Plaintiffs,          )

                               )

6    vs.                       )  3:18-cv-01110-WQH-AGS

                               )

7   CALIFORNIA DEPARTMENT OF   )

    CORRECTIONS AND            )

8   REHABILITATION, et al.,    )

                               )

9         Defendants.          )

    _____  )

10

11

12

                DEPOSITION OF GARY T. DEANS

13

                   DATE:  MAY 29, 2019

14

                   TIME:  9:11 a.m.

15

16        LOCATION:  Salinas Valley State Prison

                     Soledad, California

17

18      REPORTED BY:  Judie A. Nicholas, CSR 12229

19

20

21

22

23

24

25   PAGES 1 - 121

                                            Page 1

```
 1    APPEARANCES:
 2    FOR THE PLAINTIFFS:
 3         LAW OFFICE OF MARK E. MERIN
           BY:  MARK E. MERIN, ESQ.
 4         1010 F Street, Suite 300
           Sacramento, California 95814
 5         TEL:  (916) 443-6911
           Email:  mark@markmerin.com
 6
 7    FOR THE DEFENDANTS:
 8         STATE OF CALIFORNIA
           DEPARTMENT OF JUSTICE
 9         OFFICE OF THE ATTORNEY GENERAL
           BY:  MARTINE N. D'AGOSTINO, ESQ.
10         455 Golden Gate Avenue, Suite 11000
           San Francisco, California  94102
11         TEL:  (415) 703-5233
           Email:  martine.dagostino@doj.ca.gov
12
13
14    ALSO PRESENT:
15         THE VIDEOGRAPHER:  Joshua Headrick
16
17
18
19
20
21
22
23
24
25
```

Page  2

```
 1                    I N D E X
 2  Examination by:                           Page
 3          Ms. D'Agostino                        5
 4          Mr. Merin                           118
 5
 6
 7                  E X H I B I T S
 8  NUMBER              DESCRIPTION           PAGE
 9  Exhibit 1    Inmate Parolee Appeal 9/11/19   91
                 Bates AGO 007835, 007836,
10               007837, 007838, 007839, 007840
11  Exhibit 2    Government Claim Form, Bates   101
                 AGO007815-007824
12
    Exhibit 3    Complaint for Violation of    108
13               Civil and Constitutional Rights
                 Demand for Jury Trial, Pgs 1-24
14
    Exhibit 4    Sketch                        118
15
16
17
18
19
20
21
22  Appearance Page                             2
23
24  Deponent's Signature Page                 120
25  Reporter's Certification Page             121

                                        Page  3
```

```
 1              WEDNESDAY, MAY 29, 2019

 2                   9:11 a.m.

 3                   --oOo--

 4         THE VIDEOGRAPHER:  I am Joshua Headrick,    09:10:32

 5    your videographer, and I represent Atkinson-Baker, 09:10:55

 6    Inc., in Glendale, California.                  09:10:59

 7         I am not financially interested in this   09:11:01

 8    action, nor am I a relative or employee of any  09:11:04

 9    attorney or any of the parties.                 09:11:07

10         The date is May 29th, 2019, and the time  09:11:09

11    is 9:11 a.m.                                    09:11:14

12         This deposition is taking place at Salinas 09:11:16

13    Valley State Prison, 31625 U.S. 101, Soledad,   09:11:20

14    California.                                     09:11:25

15         This is Case Number 3:18-cv-01110-WQH-AGS, 09:11:25

16    entitled Moody versus California Department of  09:11:39

17    Corrections.  The deponent is Gary T. Deans.    09:11:42

18         This deposition is being taken on behalf   09:11:48

19    of the defendant.                               09:11:50

20         The court reporter is Judie Nicholas, from 09:11:51

21    Atkinson Baker, Inc.                            09:11:51

22         THE REPORTER:  Creekside.                  09:12:01

23         THE VIDEOGRAPHER:  Counsel will now        09:12:02

24    introduce themselves.                           09:12:04

25         After all counsel present have introduced  09:12:06
```

Page 4

```
 1     themselves, then the witness gets sworn in.        09:12:08
 2            MR. MERIN:  I'm Mark Merin for the          09:12:10
 3     plaintiffs.                                        09:12:12
 4            MS. D'AGOSTINO:  Good morning.  Martine     09:12:13
 5     D'Agostino for the defendants.                     09:12:15
 6            THE REPORTER:  Do you want me to swear the  09:12:??
 7     witness?
 8            MS. D'AGOSTINO:  Yes.
 9                    GARY T. DEANS,
10                being first duly sworn,
11         was deposed and testified as follows:
12                    EXAMINATION
13     BY MS. D'AGOSTINO:
14         Q.  Good morning, Mr. Deans.                   09:12:43
15         A.  Good morning.                              09:12:45
16         Q.  Thank you for appearing today.             09:12:46
17            My name is Martine D'Agostino, and, as I    09:12:47
18     said earlier, I represent defendants in this case, 09:12:50
19     which is Moody versus CDCR.                        09:12:53
20            I just wanted to go over some ground rules  09:12:56
21     before we get started with the deposition.         09:12:58
22            Have you ever testified before?             09:13:01
23         A.  No.                                        09:13:02
24         Q.  Have you testified in court perhaps?       09:13:04
25         A.  No.                                        09:13:07
```

Page 5

| | | |
|---|---|---|
| 1 | Q.  If I said his name was Salazar -- | 09:40:34 |
| 2 | A.  Salazar. | 09:40:36 |
| 3 | Q.  -- does that sound right to you? | 09:40:38 |
| 4 | A.  Uh-huh. | 09:40:40 |
| 5 | Q.  Rather than talking about specifically | 09:40:41 |
| 6 | Officer Salazar, I'd like to talk about the date | 09:40:44 |
| 7 | July 17, 2017.  Is that okay? | 09:40:48 |
| 8 | A.  Yes. | 09:40:52 |
| 9 | Q.  Can you recall how your day started? | 09:40:52 |
| 10 | A.  My day always starts off good. | 09:40:53 |
| 11 | It always starts off with a prayer. | 09:40:56 |
| 12 | Q.  Okay. | 09:40:56 |
| 13 | A.  So it started good. | 09:40:59 |
| 14 | It didn't end good, but I got up that | 09:41:01 |
| 15 | morning, thanking God for waking me up that | 09:41:06 |
| 16 | morning, went to breakfast, came back from | 09:41:10 |
| 17 | breakfast, waited on pill call. | 09:41:15 |
| 18 | Pill call was released.  Then on my way to | 09:41:21 |
| 19 | pill call, the yard went down, which means there | 09:41:29 |
| 20 | was an alarm on the door, there was something | 09:41:32 |
| 21 | going on outside of the building. | 09:41:36 |
| 22 | We couldn't see what was going on, just | 09:41:38 |
| 23 | all the staff just put the dayroom down and then | 09:41:41 |
| 24 | they ran outside to attend to whatever it was they | 09:41:45 |
| 25 | needed to attend to. | 09:41:50 |

Page 29

```
 1      Q.  Uh-huh.                                    09:41:54

 2      A.  During that, there was a -- in the --      09:41:55

 3   Moody, who was talking with the counselor, the    09:42:00

 4   counselor didn't have time for Inmate Moody.  He  09:42:04

 5   closed the door in Inmate Moody's face.           09:42:13

 6        I guess it made Moody feel disrespected      09:42:17

 7   behind that, and he went in the counselor's office 09:42:21

 8   and jumped on him.                                09:42:28

 9        The counselor was trying to defend himself   09:42:32

10   and try to get out, because when Inmate Moody went 09:42:38

11   in, he closed the door behind him.                09:42:42

12        And then the counselor finally got loose,    09:42:46

13   got the door opened, came out.  Then he started   09:42:50

14   signaling towards the tower to hit the alarm.     09:42:56

15        The guy that was in the tower was at the     09:43:01

16   back window seeing what was going on on the first 09:43:03

17   alarm.                                            09:43:07

18        And then Inmate Moody straddled the          09:43:11

19   counselor, and then the officer -- correctional   09:43:19

20   officer yelled a little bit, so the guy in the    09:43:24

21   tower came to see what was going on and then he -- 09:43:27

22   saying something over his walkie-talkie, and then 09:43:32

23   he fired a shot.                                  09:43:34

24        All the officers came running in there       09:43:38

25   seeing Inmate Moody, seeing a lot of blood on the 09:43:41
```

Page 30

```
1    floor, and then a pepper spray of Moody.  One of     09:43:45
2    the officers handcuffed him -- handcuffed him, and   09:43:56
3    then I remember a sergeant running in through the    09:44:05
4    rotunda, seeing all the blood, seeing who was in     09:44:09
5    handcuffs, kicked Inmate Moody in the face.          09:44:13
6         I seen an officer hit him with a baton.         09:44:22
7    And the dayroom was still down, and then a whole     09:44:33
8    lot of officers came and went running in there,      09:44:36
9    like about 50 of them, if not more.                  09:44:39
10        And there was only like -- maybe 15 people      09:44:45
11   out in the dayroom, inmates, and then all the        09:44:52
12   officers went outside, which is pretty unusual       09:45:01
13   because there was no officer in there supervising    09:45:07
14   us, or keeping a watch over us, and then they came   09:45:11
15   back in a minute later, and then Officer Salazar     09:45:15
16   was standing by the podium directing traffic, told   09:45:22
17   us to get up, everybody taken home and come this     09:45:26
18   way and then go this way, because we all live in A   09:45:32
19   Section, and then when I walked by Officer           09:45:36
20   Salazar, he sucker-punched me, no knocked me out     09:45:39
21   and I hit the floor, and the next day I know I had   09:45:45
22   officers jumping on me, twisting my leg and          09:45:51
23   handcuffing me.                                      09:45:57
24        And then I'm laying down on the floor.  I       09:45:59
25   hear a lot of yelling, I hear a lot of screaming.    09:46:03
```

Page 31

```
 1    I hear a lot of people saying "That ain't right.      09:46:06
 2    We're going to write you up.  We see everything."      09:46:11
 3          Then I seen some officers go to Inmate            09:46:18
 4    Williams' cell, tell Inmate Williams "Shut the         09:46:22
 5    fuck up.  You ain't saying nothing," and then they     09:46:30
 6    threw him back in the cell, and then they went to      09:46:34
 7    another guy's cell, some white guy that was in C       09:46:37
 8    pod, pulled him out, talked trash to him, put him      09:46:42
 9    back in the cell, and then I seen some officers go     09:46:46
10    towards Inmate Jones, grab him, rough him up, cuff     09:46:54
11    him up, and then escort him out and escort me out.     09:47:04
12          When I got outside and looked, there was a       09:47:11
13    lot of inmates outside and a lot of staff outside      09:47:17
14    with -- I guess you'd could call it like a             09:47:20
15    solitary line where -- it was just a lot of            09:47:26
16    officers lined up with pepper sprays out, with         09:47:29
17    their pepper spray out, and then they had block        09:47:33
18    guns on the yard also.                                 09:47:41
19          (Reporter interruption.)                         09:47:41
20          THE WITNESS:  Block guns.                         09:47:41
21          MS. D'AGOSTINO:  Q.  Well, thank you.             09:47:43
22          That was a pretty thorough explanation.  I       09:47:46
23    just want to ask you some follow-up questions.         09:47:49
24          So you said that you got up that morning         09:47:51
25    and came back from breakfast.                          09:47:54
```

Page 32

| | | |
|---|---|---|
| 1 | A.   Uh-huh. | 09:49:03 |
| 2 | It was -- excuse me. | 09:49:04 |
| 3 | It was 101 to 109 and 201 to 209. | 09:49:09 |
| 4 | Q.   So you're referring to cell numbers? | 09:49:17 |
| 5 | A.   Yes. | 09:49:19 |
| 6 | Q.   What cell number was yours? | 09:49:19 |
| 7 | A.   108. | 09:49:22 |
| 8 | Q.   You said 101 to 109 and 201 to 209? | 09:49:23 |
| 9 | A.   Yes. | 09:49:29 |
| 10 | Q.   Did all of the inmates in those cells | 09:49:30 |
| 11 | leave their cells for pill call? | 09:49:34 |
| 12 | A.   No, everybody don't take medication in the | 09:49:36 |
| 13 | mornings.  Some people take them in the afternoons | 09:49:38 |
| 14 | or in the evening or at night, but the ones that | 09:49:43 |
| 15 | take it in the morning come out. | 09:49:46 |
| 16 | Q.   Okay.  Do you recall approximately how | 09:49:48 |
| 17 | many inmates came out? | 09:49:49 |
| 18 | A.   Yeah, probably about -- between 10 and 12. | 09:49:52 |
| 19 | Q.   Were you double-celled at the time? | 09:49:57 |
| 20 | A.   Yes. | 09:50:02 |
| 21 | Q.   Who was your cellmate? | 09:50:03 |
| 22 | A.   Sean Hayes. | 09:50:05 |
| 23 | Q.   Sean Hayes? | 09:50:10 |
| 24 | A.   Yes. | 09:50:10 |
| 25 | Q.   So is it correct that when you were in | 09:50:11 |

Page 34

| | | |
|---|---|---|
| 1 | line for pill call, there were about 10 to 12 | 09:50:20 |
| 2 | other inmates in line with you? | 09:50:25 |
| 3 | A. We never made it to the pill call line. | 09:50:26 |
| 4 | Q. Oh, okay. What happened? | 09:50:30 |
| 5 | A. There was an incident on the yard. | 09:50:33 |
| 6 | Q. Okay. So immediately after leaving your | 09:50:36 |
| 7 | cell for pill call you heard an alarm; is that | 09:50:40 |
| 8 | right? | 09:50:45 |
| 9 | A. Uh-huh. Yes. | 09:50:45 |
| 10 | Q. Do you recall what code the alarm was? | 09:50:47 |
| 11 | A. Oh, it was a one-on-one. | 09:50:49 |
| 12 | Q. Okay. | 09:50:52 |
| 13 | A. Which means that it was one inmate on one | 09:50:52 |
| 14 | inmate. | 09:50:55 |
| 15 | Q. And if you recall, at the time that you | 09:51:00 |
| 16 | heard the alarm, how many officers were on the | 09:51:03 |
| 17 | dayroom floor? | 09:51:06 |
| 18 | A. Two. | 09:51:08 |
| 19 | Q. And do you know who they were? | 09:51:09 |
| 20 | A. No. | 09:51:11 |
| 21 | Q. Do you recall if you recognized them at | 09:51:50 |
| 22 | the time? In other words, were they regular | 09:51:55 |
| 23 | officers in that unit? | 09:51:58 |
| 24 | A. Yeah. | 09:52:14 |
| 25 | I think it was -- there was one regular | 09:52:15 |

Page 35

```
 1            MS. D'AGOSTINO:  Q.  Okay.  That's fair.    09:56:32
 2        So you said that the two dayroom building     09:56:34
 3   officers left the dayroom and went outside to      09:56:40
 4   respond to the alarm; is that right?               09:56:43
 5      A.  Yes.                                         09:56:45
 6      Q.  And Counselor Forte did not.                09:56:46
 7      A.  No.                                          09:56:50
 8      Q.  And he was in his office.                   09:56:52
 9        Did he stay in his office during the          09:56:55
10   alarm?                                             09:56:56
11      A.  He was in his doorway --                    09:56:57
12            (Reporter interruption.)                  09:56:57
13        Yes, of his office.                           09:57:03
14      Q.  Okay.  So, after staff put the dayroom      09:57:05
15   down did you see Inmate Moody get down as well?    09:57:19
16      A.  Yes.                                         09:57:23
17        Yes.  Everybody has to get down.             09:57:24
18      Q.  And then you said -- I believe you said     09:57:28
19   Moody was talking with the counselor, so did he    09:57:31
20   get up after being ordered prone on the dayroom    09:57:34
21   floor?                                             09:57:38
22      A.  Yes.                                         09:57:40
23      Q.  So he ignored the instruction to get down   09:57:41
24   and got up and started talking to the counselor?   09:57:45
25      A.  No, no.                                      09:57:48
```

Page 39

```
1              He talked to the -- no, he proned down.      09:57:49

2       Q.   And then how did he --                         09:57:52

3       A.   And then he was talking with the               09:57:54

4    counselor, and the counselor closed the door on        09:57:57

5    him.                                                    09:58:00

6       Q.   So he was talking to the counselor while       09:58:01

7    proned out?                                             09:58:04

8       A.   Uh-huh.                                         09:58:04

9       Q.   And where was he lying down?                    09:58:05

10      A.   In front of his office.                         09:58:07

11      Q.   Okay.  And so when you say closed the door      09:58:08

12   on him, you closed the door on him while he was         09:58:15

13   lying down?                                             09:58:19

14      A.   Yes.  "Proned out" is the word.                 09:58:19

15      Q.   Where were you in relation to Forte and         09:58:23

16   Moody?                                                  09:58:26

17      A.   From here to there (indicating).                09:58:27

18      Q.   So could we say three feet?                     09:58:30

19      A.   Yes.  Yes.                                      09:58:33

20           MR. MERIN:  Just a moment.                      09:58:39

21           Are you estimating the width of the table,      09:58:40

22   because I would say it's closer to five feet.           09:58:43

23           MS. D'AGOSTINO:  Q.  Well... I think he         09:58:48

24   gestured from him to the court reporter; is that        09:58:49

25   right?                                                  09:58:49
```

Page 40

| | | |
|---|---|---|
| 1 | Q.  Uh-huh. | 10:00:14 |
| 2 | A.  Court-ordered phone call or something, | 10:00:14 |
| 3 | something that had to do with a lawsuit, I guess, | 10:00:18 |
| 4 | from what it sounded like to me. | 10:00:25 |
| 5 | Q.  Uh-huh. | 10:00:27 |
| 6 | Did you have any conversation with Moody | 10:00:28 |
| 7 | after the fact about whether or not he felt | 10:00:30 |
| 8 | disrespected by Counselor Forte. | 10:00:32 |
| 9 | A.  No, it was only obvious. | 10:00:35 |
| 10 | Q.  So you didn't talk about it with him? | 10:00:39 |
| 11 | A.  No. | 10:00:42 |
| 12 | Q.  And then you saw Moody stand up and go | 10:00:43 |
| 13 | into the counselor's office; is that right? | 10:00:46 |
| 14 | A.  Yes. | 10:00:46 |
| 15 | Q.  How long were Moody and Forte in the | 10:00:49 |
| 16 | office with the door closed? | 10:00:56 |
| 17 | A.  Seemed like forever. | 10:01:00 |
| 18 | Q.  Yeah. | 10:01:02 |
| 19 | A.  I guess it was -- actually, if I had to | 10:01:09 |
| 20 | take a wild guess, I would say a minute or less, | 10:01:12 |
| 21 | less than a minute. | 10:01:19 |
| 22 | Q.  And you said he jumped on him; is that | 10:01:24 |
| 23 | right? | 10:01:29 |
| 24 | A.  Straddle. | 10:01:29 |
| 25 | Q.  When they were in the office did he | 10:01:30 |

Page 42

```
1    straddle him?                                    10:01:33

2        A.   No.                                     10:01:34

3        Q.   Okay, so you said he went in the office 10:01:34

4    and jumped on him.   Jumped on him.              10:01:37

5        A.   Jumped on him.                          10:01:38

6             That's just a sign of fighting.         10:01:39

7        Q.   Did you see him throw punches?          10:01:41

8        A.   Yes.                                    10:01:44

9        Q.   So you saw Moody punch Forte?           10:01:45

10       A.   Yes.                                    10:01:49

11       Q.   Where on Forte's body did he punch him? 10:01:50

12       A.   In the face.                            10:01:54

13       Q.   Anywhere else?                          10:01:55

14       A.   No, not that I -- I just seen face shots. 10:01:57

15       Q.   Did you see those punches land?         10:02:02

16       A.   Yes.                                    10:02:04

17       Q.   And did you -- while that was going on, 10:02:04

18   did you say anything or do anything?            10:02:07

19       A.   Yeah, it was kind of like shocking him and 10:02:11

20   surprising actually, but the only thing I did was 10:02:17

21   just got the hell out the way.                  10:02:23

22       Q.   How did you get out of the way?         10:02:25

23       A.   You have to the rolled, so I just      10:02:27

24   rolled -- scooted.                              10:02:31

25       Q.   But while they were in the office you   10:02:32
```

Page 43

```
 1        Q.  And where were they standing after he      10:05:50

 2   opened the door?                                     10:05:53

 3        A.  By the office.                              10:05:54

 4        Q.  So sort of standing in the doorway of the   10:05:56

 5   office?                                              10:05:58

 6        A.  He must have slipped and fell or            10:05:59

 7   something.                                           10:06:03

 8        Q.  Okay.  So Forte was on the ground --        10:06:03

 9        A.  Yes.                                         10:06:06

10        Q.  -- in the doorway to the office?            10:06:07

11        A.  Yes.                                         10:06:11

12        Q.  And was that when Moody straddled him?      10:06:12

13        A.  Yes.                                         10:06:19

14        Q.  And what did he do when he straddled him?   10:06:19

15        A.  He punched him.                             10:06:26

16        Q.  Where did he punch him?                     10:06:28

17        A.  In the face.                                10:06:29

18        Q.  So Forte had his head against the cement    10:06:30

19   floor and Moody punched him in the face?            10:06:34

20        A.  Yes.                                         10:06:36

21        Q.  Do you recall approximately how far away    10:06:37

22   from the two of them you were when you saw this      10:06:40

23   happen?                                              10:06:43

24        A.  A few feet.  Maybe from here to the wall.   10:06:44

25        Q.  Okay, so maybe like ten feet.              10:06:50
```

Page 47

| | | |
|---|---|---|
| 1 | You were close enough so you could see it | 10:06:56 |
| 2 | clearly. | 10:06:59 |
| 3 | A.   Yes. | 10:06:59 |
| 4 | Q.   And how long did that go on that Moody was | 10:07:00 |
| 5 | straddling Forte and punching him? | 10:07:10 |
| 6 | A.   Just a few seconds. | 10:07:12 |
| 7 | Q.   And what stopped it, if anything? | 10:07:15 |
| 8 | A.   Gun shot. | 10:07:17 |
| 9 | Q.   Gun shot? | 10:07:20 |
| 10 | A.   From the tower. | 10:07:21 |
| 11 | Q.   I see. | 10:07:23 |
| 12 | So you said that Forte yelled and the | 10:07:24 |
| 13 | tower guy took notice; is that right? | 10:07:26 |
| 14 | A.   Yes. | 10:07:28 |
| 15 | Q.   And do you know what kind of round was | 10:07:29 |
| 16 | shot?  For example, was it a live round, a bullet, | 10:07:40 |
| 17 | was it a projectile? | 10:07:50 |
| 18 | A.   No, it wasn't a live round.  No, it was, I | 10:07:53 |
| 19 | guess, a projectile. | 10:07:58 |
| 20 | Q.   Are you familiar with the projectiles that | 10:07:59 |
| 21 | are used within prison? | 10:08:02 |
| 22 | A.   It was a block gun. | 10:08:02 |
| 23 | Q.   A block gun? | 10:08:02 |
| 24 | A.   Yeah, it wasn't a live gun, no. | 10:08:05 |
| 25 | Q.   Was that a foam -- what's the word -- tip? | 10:08:08 |

Page 48

```
 1        A.   Foam.                                        10:08:14

 2        Q.   Do you know if it's made out of foam?       10:08:15

 3        A.   It's rubber.                                10:08:18

 4        Q.   It's rubber?                                10:08:19

 5        A.   I think rubber.  I'm not sure.              10:08:20

 6        Q.   Okay.  Did you see where it landed?         10:08:23

 7        A.   It actually hit Fortuti.                    10:08:25

 8        Q.   Forte?                                      10:08:33

 9        A.   Forte.                                      10:08:34

10        Q.   Okay.                                       10:08:35

11        A.   In the face.  Forte.                        10:08:35

12        Q.   Forte.                                      10:08:41

13             And did the tower officer also announce an  10:08:43

14   alarm?                                                10:08:50

15        A.   Yes.                                        10:08:51

16        Q.   Did he do that before or after he fired     10:08:52

17   the round?                                            10:08:55

18        A.   After.                                      10:08:56

19        Q.   Do you recall what the alarm was?           10:08:57

20        A.   Yeah, on the walkie-talkie.                 10:08:59

21        Q.   Did you hear it?                            10:09:01

22        A.   No.                                         10:09:03

23        Q.   Did an alarm sound in the building?         10:09:05

24        A.   No, there was already an alarm going, so    10:09:08

25   it's -- he just -- over his radio.                    10:09:12
```

                                               Page 49

| | | |
|---|---|---|
| 1 | Q.   Uh-huh. | 10:09:16 |
| 2 | Did you see him do that? | 10:09:17 |
| 3 | A.   Uh-huh. | 10:09:18 |
| 4 | Yes. | 10:09:19 |
| 5 | Q.   And then how soon after he fired the shot | 10:09:21 |
| 6 | did other officers enter the building? | 10:09:24 |
| 7 | A.   Within seconds. | 10:09:29 |
| 8 | Q.   Do you recall how many entered the | 10:09:31 |
| 9 | building? | 10:09:33 |
| 10 | A.   Yeah, a lot.  Like 50, if not more. | 10:09:34 |
| 11 | Q.   All at once? | 10:09:45 |
| 12 | A.   Well -- | 10:09:47 |
| 13 | Q.   So immediately after the shot was fired | 10:09:51 |
| 14 | how many officers entered the building? | 10:09:54 |
| 15 | A.   Probably about 30. | 10:09:56 |
| 16 | Q.   Did you recognize any of them? | 10:10:00 |
| 17 | A.   The majority of them was regular building | 10:10:02 |
| 18 | officers and yard officers. | 10:10:06 |
| 19 | Q.   And who were they, if you can name names. | 10:10:09 |
| 20 | A.   There's -- there's Officer Duran. | 10:10:13 |
| 21 | Q.   Uh-huh. | 10:11:06 |
| 22 | A.   Sergeant McGee. | 10:11:07 |
| 23 | Q.   Uh-huh. | 10:11:13 |
| 24 | A.   Squad officers. | 10:11:24 |
| 25 | Q.   Uh-huh. | 10:11:26 |

Page 50

| | | |
|---|---|---|
| 1 | A.  Yes. | 10:28:54 |
| 2 | Q.  Did you -- | 10:28:54 |
| 3 | A.  No. | 10:28:57 |
| 4 | Q.  Oh, go ahead. | 10:28:59 |
| 5 | A.  No, Forte was not on the ground. | 10:29:00 |
| 6 |     When they pepper sprayed Moody? | 10:29:05 |
| 7 | Q.  Yes. | 10:29:06 |
| 8 | A.  No. | 10:29:07 |
| 9 | Q.  Where was he? | 10:29:08 |
| 10 | A.  The officers was helping him to the | 10:29:08 |
| 11 | nurses' station. | 10:29:10 |
| 12 | Q.  Okay.  So I think you testified earlier | 10:29:11 |
| 13 | the officers came running in, saw blood and pepper | 10:29:15 |
| 14 | sprayed Moody, and so they -- so how did they get | 10:29:19 |
| 15 | Moody off Forte, if you saw that? | 10:29:27 |
| 16 | A.  Yeah, they pepper sprayed him, and one of | 10:29:28 |
| 17 | the officers hit him with the stick, with the | 10:29:33 |
| 18 | baton. | 10:29:35 |
| 19 | Q.  Is that how they stopped Moody's attack on | 10:29:36 |
| 20 | Forte? | 10:29:39 |
| 21 | A.  Yes. | 10:29:39 |
| 22 | Q.  They pepper sprayed him? | 10:29:40 |
| 23 | A.  Yes. | 10:29:41 |
| 24 | Q.  So when they pepper sprayed Moody, where | 10:29:42 |
| 25 | was Forte? | 10:29:46 |

Page 62

| | | |
|---|---|---|
| 1 | A.  There was so many officers in there at one | 10:30:49 |
| 2 | time, it was chaotic in there. | 10:30:52 |
| 3 | Q.  Did you recognize the officer who batoned | 10:30:56 |
| 4 | Moody? | 10:30:59 |
| 5 | A.  Yeah, I think it was Salazar. | 10:31:00 |
| 6 | Q.  The other officers who were in the | 10:31:10 |
| 7 | building, what were they doing while Moody was | 10:31:13 |
| 8 | being pepper sprayed and batoned? | 10:31:17 |
| 9 | MR. MERIN:  Object to the form of the | 10:31:19 |
| 10 | question. | 10:31:24 |
| 11 | MS. D'AGOSTINO:  Q.  You can answer. | 10:31:24 |
| 12 | A.  What was Moody doing? | 10:31:25 |
| 13 | Q.  No, what were the other officers in the | 10:31:26 |
| 14 | building doing? | 10:31:28 |
| 15 | A.  They had a perimeter, I guess, around like | 10:31:29 |
| 16 | the inmates that was in the building being -- that | 10:31:33 |
| 17 | was broken down, just so things wouldn't get out | 10:31:41 |
| 18 | of hand. | 10:31:45 |
| 19 | Q.  Did they have weapons drawn, if you | 10:31:55 |
| 20 | recall? | 10:31:58 |
| 21 | A.  Pepper spray. | 10:31:58 |
| 22 | Q.  That's it? | 10:32:00 |
| 23 | A.  Besides the guy in the tower. | 10:32:01 |
| 24 | Q.  So the officers who were forming a | 10:32:06 |
| 25 | perimeter, did he have weapons drawn? | 10:32:08 |

Page 64

```
 1        A.   Pepper spray in the building.              10:32:11

 2             Outside the building they had weapons,     10:32:13

 3   block guns.                                          10:32:17

 4        Q.   I see.  The inmates who were -- sorry,     10:32:18

 5   strike that.                                         10:32:22

 6             The officers who were forming the          10:32:23

 7   perimeter, had they drawn their pepper spray and     10:32:25

 8   were holding them in their hands?                    10:32:29

 9        A.   Yes.                                        10:32:29

10        Q.   And you said one officer handcuffed Moody. 10:32:33

11        A.   Yes.                                        10:32:42

12        Q.   Was he lying on the ground at the time he  10:32:43

13   was handcuffed?                                       10:32:47

14        A.   Moody?                                      10:32:48

15        Q.   Yes.                                        10:32:49

16        A.   Yes.                                        10:32:50

17        Q.   Was he face up or face down, if you can    10:32:51

18   recall?                                               10:32:54

19        A.   He was face down.                           10:32:54

20        Q.   Do you recall the officers that handcuffed 10:32:55

21   him?                                                  10:32:58

22        A.   There's so many officers that -- the       10:32:58

23   inmates -- it shouldn't take six or seven officers   10:33:04

24   for that.                                             10:33:09

25        Q.   For what?                                   10:33:11
```

Page 65

1      Q.   I'm sorry, you said he was face down when      10:34:09

2    he was handcuffed; is that right?                     10:34:12

3      A.   Yes.                                            10:34:13

4      Q.   Was -- were leg restraints applied?            10:34:14

5      A.   No.                                             10:34:15

6      Q.   And then you said a sergeant ran in and        10:34:19

7    kicked Moody?                                          10:34:21

8      A.   Yes.                                            10:34:22

9      Q.   Was the sergeant in the room before that       10:34:23

10   or did you see him run through the door?              10:34:24

11     A.   I seen him run through the retirement          10:34:27

12   door, yes.                                             10:34:30

13     Q.   Okay, and do you recall who that was?          10:34:31

14     A.   McGee.                                          10:34:31

15     Q.   And where did he kick Moody, on Moody's        10:34:35

16   person?                                                10:34:37

17     A.   In the face.                                    10:34:37

18     Q.   After Moody was handcuffed?                     10:34:38

19     A.   Yes.                                            10:34:40

20     Q.   Did anyone else use force against Moody        10:34:42

21   that you saw after he was handcuffed?                  10:35:00

22          MR. MERIN:   Object to the form of the         10:35:02

23   question.                                              10:35:03

24          MS. D'AGOSTINO:   Q.   Do you understand the   10:35:09

25   question?                                              10:35:09

Page 67

```
 1        A.  No.                                        10:35:10

 2        Q.  Did anyone else hit or kick or baton Moody 10:35:11

 3   after he was handcuffed, besides what you           10:35:19

 4   described to me of Sergeant McGee kicking him in    10:35:22

 5   the face?                                           10:35:26

 6        A.  Yeah.  He was hit with a baton.            10:35:26

 7        Q.  By whom?                                   10:35:28

 8        A.  One of the officers.                       10:35:29

 9        Q.  Did you recognize the officer?            10:35:31

10        A.  I don't -- no.                             10:35:32

11        Q.  Is that all?  Any other force used against 10:35:56

12   Moody after he was handcuffed while he was on the   10:35:59

13   floor?                                              10:36:01

14            MR. MERIN:  Object to the form of the      10:36:02

15   question.                                           10:36:03

16            THE WITNESS:  Not that I can recall, no.   10:36:15

17            MS. D'AGOSTINO:  Q.  At this time were      10:36:29

18   there still approximately 10 to 15 inmates in the   10:36:30

19   dayroom?                                            10:36:33

20        A.  When?                                      10:36:34

21        Q.  After Moody was handcuffed?                10:36:35

22        A.  Yes.                                       10:36:39

23        Q.  And all the inmates were still lying prone 10:36:40

24   on the floor?                                       10:36:46

25        A.  Yes.  That's policy.                       10:36:47
```

Page 68

```
 1          Q.  So -- okay.                              10:36:51
 2          A.  I don't have to prone out because I wear a 10:36:55
 3   vest, so any inmate that wears a vest doesn't have 10:37:02
 4   to be proned out because he has a -- it's a form    10:37:07
 5   of disability.                                      10:37:13
 6          Q.  Uh-huh.                                  10:37:15
 7          A.  But because the incident was so serious  10:37:16
 8   was while I proned out.  I didn't want to be        10:37:20
 9   mistaken for somebody that participated in the --   10:37:25
10   or was beat with that, so I proned out.             10:37:33
11          Q.  I thought you said you proned out when you 10:37:37
12   heard the first alarm; is that right?              10:37:40
13          A.  I don't think you understood what I said. 10:37:41
14          Q.  Okay.                                    10:37:44
15          A.  I said I don't have to.                  10:37:44
16          Q.  I understand that, yeah.  You don't have 10:37:46
17   to.                                                 10:37:48
18              And then I think you said that the       10:37:59
19   officers went outside, which you found unusual.     10:38:01
20              Is that what you said?                   10:38:05
21          A.  Yes.                                     10:38:07
22          Q.  Why did you find it unusual?             10:38:07
23          A.  Because they usually keep somebody in    10:38:10
24   the -- around the area.  The officers -- you never 10:38:12
25   see them where all the officers leave the scene of 10:38:19
```

                                              Page 69

```
 1    the crime or the incident, or whatever you want to    10:38:26
 2    call it.                                              10:38:29
 3            That's unheard of.                            10:38:30
 4       Q.  And you testified earlier that a large         10:38:35
 5    number of officers came into the building.            10:38:38
 6            I think you estimated about 50; is that       10:38:40
 7    right?                                                10:38:42
 8       A.  Yeah.  It was a lot.                           10:38:42
 9       Q.  Is 50 -- was that your estimate?               10:38:44
10       A.  Yeah, I said that.                             10:38:47
11       Q.  Yes.                                           10:38:49
12            So did all 50 of them leave the building      10:38:51
13    at that time?                                         10:38:54
14       A.  Yes.                                           10:38:56
15       Q.  And did you hear an order for all the          10:38:58
16    officers to leave the building?                       10:39:02
17       A.  No.                                            10:39:04
18       Q.  And how long were they gone for, if you        10:39:07
19    can recall?                                           10:39:10
20       A.  Less than a minute.                            10:39:10
21       Q.  And then what happened?  Did they all          10:39:15
22    return?                                               10:39:17
23       A.  The majority of them did.                      10:39:17
24            Some of them stayed outside.                  10:39:20
25            After they escorted us out, you could see     10:39:25
```

Page 70

```
 1    like the silver train line -- they had the gate        10:39:29
 2    open, they had officers lined up about -- some of       10:39:34
 3    them had block guns, some of them had batons out,       10:39:38
 4    pepper spray out.                                       10:39:42
 5        Q.  Okay, I want to focus on what happened in       10:39:44
 6    the building, if that's okay, now.                      10:39:47
 7        A.  Okay.                                           10:39:50
 8        Q.  We'll certainly get to that.                    10:39:50
 9            So then can you estimate how many               10:39:52
10    returned?                                               10:39:54
11        A.  No.                                             10:40:04
12        Q.  Was it more than ten?                           10:40:05
13        A.  Yeah.                                           10:40:07
14        Q.  Was it more than 15?                            10:40:08
15        A.  It was about 15.                                10:40:09
16        Q.  Okay.  And then I think you said that           10:40:11
17    Salazar told everyone to return to their cells; is      10:40:24
18    that right?                                             10:40:28
19        A.  Yeah, he was directing traffic.                 10:40:28
20        Q.  What did he say specifically, if you            10:40:31
21    recall?                                                 10:40:33
22        A.  For you to stand up and come this way.          10:40:33
23    You over there, you stand up and come this way.         10:40:36
24        Q.  So was he directing inmates one at a time?      10:40:40
25        A.  Yeah, seemed like, yes.                         10:40:44
```

Page 71

| | | |
|---|---|---|
| 1 | Q.  If you recall, was he waiting for an | 10:40:46 |
| 2 | inmate to get back to his cell before instructing | 10:40:49 |
| 3 | the next inmate to return to his cell? | 10:40:52 |
| 4 | A.  No. | 10:40:56 |
| 5 | MR. MERIN:  Object to the form of the | 10:40:56 |
| 6 | question. | 10:40:58 |
| 7 | A.  No. | 10:40:58 |
| 8 | Q.  No?  But he was specifically identifying | 10:40:59 |
| 9 | inmates to return to their cells. | 10:41:02 |
| 10 | A.  Yes. | 10:41:04 |
| 11 | Q.  And then did he specifically tell you to | 10:41:14 |
| 12 | return to your cell? | 10:41:17 |
| 13 | A.  Yes. | 10:41:19 |
| 14 | Q.  And where was he in relation to you when | 10:41:19 |
| 15 | he said that, if you remember? | 10:41:22 |
| 16 | A.  In the middle of the dayroom. | 10:41:24 |
| 17 | Q.  Approximately how many feet away from you? | 10:41:28 |
| 18 | A.  Maybe six feet. | 10:41:33 |
| 19 | Q.  Okay.  Did he know you by name? | 10:41:42 |
| 20 | A.  I doubt it, because I don't -- I don't | 10:41:45 |
| 21 | interact.  I pretty much keep to myself. | 10:41:56 |
| 22 | Q.  How did he identify you, if he did | 10:42:01 |
| 23 | identify you? | 10:42:04 |
| 24 | A.  He pointed, "You come this way." | 10:42:05 |
| 25 | Q.  Could you see at that time if there were | 10:42:11 |

Page 72

```
 1   any other officers directing inmates to return to   10:42:13
 2   their cell?                                          10:42:17
 3       A.   No, he was the only one.                    10:42:17
 4       Q.   What were the other officers doing, if you  10:42:19
 5   know?                                                10:42:21
 6       A.   Standing by the inmates.                     10:42:22
 7       Q.   Okay.   Did you hear noises?                 10:42:26
 8       A.   A lot of noise.                              10:42:29
 9       Q.   What was the noise?                          10:42:31
10       A.   People was actually mad because they seen   10:42:33
11   one of the officers hit Moody with the baton and     10:42:40
12   then the sergeant kick Moody.                        10:42:46
13       Q.   Uh-huh.                                      10:42:49
14            What were people saying?                     10:42:50
15       A.   That they was going to write him up and go  10:42:51
16   to internal affairs, and that wasn't right, you      10:42:55
17   know, things of that nature.                          10:42:59
18       Q.   And do you know who was saying those         10:43:00
19   things?                                               10:43:00
20       A.   A little bit of everybody.                   10:43:03
21       Q.   Okay.                                        10:43:05
22       A.   Everybody was mad.                           10:43:05
23       Q.   Did you recognize any of the voices?         10:43:07
24       A.   Yeah.   Yeah.                                10:43:11
25       Q.   And who are they, if you know?              10:43:13
```

Page 73

```
 1        A.   It was a lot of them.  Everybody.        10:43:15

 2             But that one particular was actually     10:43:19

 3   singled out because he was more boisterous than    10:43:24

 4   others.                                            10:43:29

 5        Q.   And who was that?                         10:43:29

 6        A.   Inmate Williams.                          10:43:30

 7        Q.   Okay.  So as you were -- when did you hear 10:43:32

 8   Inmate Williams?  Do you recall hearing him --     10:43:36

 9   what he was specifically yelling?                  10:43:43

10        A.   Yeah.                                     10:43:45

11        Q.   Where were you when you heard that?       10:43:46

12        A.   In B section.                             10:43:47

13        Q.   In your cell?                             10:43:49

14        A.   No, in B section.                         10:43:50

15             There's different sections like A section, 10:43:52

16   B section, C section.                              10:43:54

17        Q.   Uh-huh.                                   10:43:57

18        A.   And I was in --                           10:43:57

19        Q.   Were you still lying prone on the ground? 10:43:58

20        A.   Yeah.                                     10:44:01

21        Q.   Okay.                                     10:44:03

22        A.   And then when Salazar came in to direct   10:44:03

23   traffic, he pointed to me to get up.               10:44:07

24        Q.   And you were hearing Williams yell at that 10:44:10

25   time?                                              10:44:13
```

Page 74

```
 1        A.   Uh-huh.                                   10:44:13

 2             I heard a lot of people yelling and       10:44:15

 3    kicking -- kicking on the door.                    10:44:18

 4        Q.   Did you also yell?                         10:44:19

 5        A.   Yeah, I did.                               10:44:21

 6        Q.   What did you yell?                         10:44:22

 7        A.   That that wasn't -- I yelled that that    10:44:23

 8    wasn't right, something ought to be done about     10:44:28

 9    this, and that I was going to write it up.         10:44:34

10        Q.   And what were you referring to when you   10:44:38

11    were yelling "That wasn't right"?                  10:44:42

12        A.   Seeing him being kicked by a sergeant.    10:44:44

13             He was already handcuffed so he was no    10:44:49

14    threat.  The threat was resolved, and then there  10:44:51

15    was nothing that he could do because he couldn't  10:44:55

16    see because of the pepper spray.                   10:44:58

17             That pepper spray is strong.  It takes a  10:45:02

18    toll.                                              10:45:06

19        Q.   Did you experience the effects of the    10:45:06

20    pepper spray?                                      10:45:08

21        A.   I did, and I'm an asthmatic.             10:45:09

22        Q.   Sorry?                                     10:45:14

23        A.   I'm an asthmatic.                          10:45:15

24        Q.   Oh, I see.                                 10:45:18

25             What symptoms of pepper spray were you    10:45:18
```

Page 75

| | | |
|---|---|---|
| 1 | experiencing? | 10:45:20 |
| 2 | A.   Strong.   It was almost like I was pepper | 10:45:21 |
| 3 | sprayed myself. | 10:45:25 |
| 4 | Q.   So specifically what -- were your eyes | 10:45:26 |
| 5 | burning? | 10:45:31 |
| 6 | A.   My eyes, my nose was burning, my throat | 10:45:31 |
| 7 | was burning.   I always carry a rag because I have | 10:45:34 |
| 8 | a -- I wash my hands a lot, so I always need | 10:45:38 |
| 9 | something to dry my hands off with. | 10:45:43 |
| 10 | Q.   Okay. | 10:45:49 |
| 11 | A.   So when Officer Salazar directed for me to | 10:45:49 |
| 12 | get up and take it to my cell, I had a rag -- my | 10:45:55 |
| 13 | rag over my face and walking with my cane. | 10:46:02 |
| 14 | Q.   I see.   Okay. | 10:46:05 |
| 15 | And did you walk past Officer Salazar? | 10:46:08 |
| 16 | A.   Yes -- no. | 10:46:17 |
| 17 | I walked directly to him. | 10:46:19 |
| 18 | Q.   Right up to him? | 10:46:21 |
| 19 | A.   No, not right up to him. | 10:46:22 |
| 20 | He directed traffic.   "You, you come this | 10:46:25 |
| 21 | way.   You go this way." | 10:46:28 |
| 22 | Q.   So what was your path?   You walked towards | 10:46:32 |
| 23 | him and then away from him towards your cell? | 10:46:34 |
| 24 | MR. MERIN:   Object to the form of the | 10:46:37 |
| 25 | question. | 10:46:39 |

Page 76

```
 1        A.   No, I was from here to here (indicating).   10:47:39
 2        Q.   I'm trying to describe how far this is, so  10:47:41
 3   maybe three and a half, four feet?                    10:47:42
 4        A.   Okay, yes.                                   10:47:44
 5        Q.   Does that sound right?                       10:47:45
 6        A.   Yes.                                         10:47:46
 7        Q.   And were you yelling as you approached       10:47:47
 8   Salazar?                                               10:47:53
 9        A.   No.  I couldn't breathe at that time at     10:47:53
10   all.  The pepper spray had already tooken its toll    10:47:56
11   on me.                                                 10:48:00
12        Q.   And then you said he struck?                 10:48:01
13        A.   He leaned in and struck me.                  10:48:03
14        Q.   And where did he strike me?                  10:48:06
15        A.   He struck me in my face, on my left side.   10:48:08
16             Broke my glasses.                            10:48:11
17        Q.   When you say he struck you, did he use a     10:48:12
18   closed fist?                                           10:48:16
19        A.   Yes.                                         10:48:17
20        Q.   Did you fall down?                           10:48:17
21        A.   Yes.                                         10:48:18
22        Q.   I think you said you lost consciousness,     10:48:19
23   is that right?                                         10:48:22
24        A.   Uh-huh.                                      10:48:23
25        Q.   Do you know how long you lost               10:48:24
```

Page 78

```
  1    consciousness for?                             10:48:25

  2        A.  No, because when I came to, I was already  10:48:26

  3    being put in handcuffs.                        10:48:29

  4        Q.  When you came to, were you laying on the  10:48:32

  5    ground?                                        10:48:35

  6        A.  Face down.                             10:48:36

  7        Q.  So he struck you and you fell face down?  10:48:37

  8        A.  I don't know.                          10:48:41

  9            When I came to I was face down.        10:48:45

 10        Q.  Do you have any sense of how much time  10:48:49

 11    passed when you were unconscious?              10:48:53

 12        A.  No.                                    10:48:54

 13        Q.  And you said you were being handcuffed.  10:48:55

 14            Do you know who handcuffed you?        10:48:59

 15        A.  No.                                    10:49:00

 16        Q.  Was it Salazar?                        10:49:01

 17        A.  I don't know.                          10:49:02

 18        Q.  What happened after you were handcuffed?  10:49:04

 19        A.  They left me down on the ground.  One of  10:49:08

 20    them had his knee in my back, and then a few   10:49:12

 21    minutes later they picked me up and took me out.  10:49:17

 22        Q.  And you don't recall who had his hand on  10:49:25

 23    your back ether?                               10:49:28

 24        A.  My knee -- I mean his knee in my back?  10:49:28

 25        Q.  Yes.                                   10:49:31
```

Page 79

```
 1        A.   Okay.                                      10:50:44

 2        Q.   Do you recall how many officers were lined 10:50:45

 3   up?                                                  10:50:48

 4        A.   A lot.                                     10:50:48

 5        Q.   More than ten?                             10:50:50

 6        A.   Yeah.                                      10:50:51

 7        Q.   More than 15?                              10:50:53

 8        A.   About 15.                                  10:50:53

 9        Q.   And were they -- where were they lined up? 10:50:58

10        A.   In the yard.                               10:51:01

11        Q.   Where in the yard?                         10:51:03

12        A.   Across the yard, from the building to the  10:51:05

13   gate.                                                10:51:12

14        Q.   When you say from the building, do you     10:51:13

15   mean Building 14?                                    10:51:17

16        A.   Yes.                                       10:51:17

17        Q.   So there was a perimeter of officers from  10:51:18

18   the doorway of Building 14 to the gate; is that      10:51:21

19   right?                                               10:51:24

20        A.   Yes.                                       10:51:24

21        Q.   And you were escorted past those officers  10:51:25

22   when you left the yard; is that right?               10:51:28

23        A.   Yes.                                       10:51:31

24        Q.   And what happened when you got to the gym? 10:51:32

25        A.   Nothing.                                   10:51:46
```

Page 81

| | | | |
|---|---|---|---|
| 1 | Q. | Were you placed in a holding cell? | 10:51:48 |
| 2 | A. | Placed in a holding cell, yes. | 10:51:50 |
| 3 | Q. | Okay. | 10:51:53 |
| 4 | A. | And then from the holding cell to ad seg. | 10:51:54 |
| 5 | Q. | How long were you in the holding cell? | 10:51:59 |
| 6 | A. | Felt like forever. | 10:52:02 |
| 7 | Q. | Do you have a sense of how long it was? | 10:52:05 |
| 8 | A. | No. | 10:52:13 |
| 9 | Q. | Was it more than an hour? | 10:52:14 |
| 10 | A. | Yeah. | 10:52:16 |
| 11 | Q. | Was it more than two hours? | 10:52:17 |
| 12 | A. | Yeah. | 10:52:18 |
| 13 | Q. | More than three hours? | 10:52:19 |
| 14 | A. | Uh-huh. | 10:52:20 |
| 15 | Q. | More than four hours? | 10:52:21 |
| 16 | A. | Felt like it. | 10:52:22 |
| 17 | | They wouldn't let me use the bathroom. | 10:52:26 |
| 18 | | They wouldn't let me out the holding cell | 10:52:29 |
| 19 | to use the bathroom, and then I needed to sit down | 10:52:32 |
| 20 | because I'm not supposed to stand up for a long | 10:52:35 |
| 21 | time. | 10:52:48 |
| 22 | | Over three hours. | 10:52:49 |
| 23 | Q. | Okay.  Did you ask for medical attention? | 10:52:50 |
| 24 | A. | I did. | 10:52:54 |
| 25 | Q. | Who did you ask? | 10:52:55 |

Page 82

```
 1   STATE OF CALIFORNIA  )
 2   COUNTY OF MONTEREY    )
 3          The witness in the foregoing deposition
 4   appeared before me, JUDIE A. NICHOLAS, a Certified
 5   Shorthand Reporter for the State of California.
 6          Said witness was then and there, at the
 7   time and place previously stated, placed under
 8   oath by me to tell the truth, the whole truth and
 9   nothing but that truth in the testimony given on
     said day.
10          The testimony of the witness and all the
11   questions and remarks requested by counsel were
12   taken by me in shorthand at the time and place
13   therein named and, thereafter, under my direction,
14   transcribed into longhand.
15          I further certify that I am not of counsel
16   or attorney for either or any of the parties to
17   said deposition, nor in any way interested in the
18   outcome of the cause named in said caption, and
19   that I am not related to any party thereto.
20          IN WITNESS WHEREOF, I have hereunto set my
21   hand this 17th day of June, 2019.
22
23
24              <%13086,Signature%>
                Certified Shorthand Reporter
25              For the State of California

                                          Page 121
```

# EXHIBIT B

Donnel Jones
June 10, 2019

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

**EXHIBIT B**

RONNIE L. MOODY, et al.,

                    Plaintiffs,

        vs.                          Case No. 3:18-cv-01110
                                          WQH-AGS

CALIFORNIA DEPARTMENT OF
CORRECTIONS AND REHABILITATION,
et al.,

                    Defendants.
_____

VIDEOTAPED DEPOSITION OF DONNEL JONES

June 10, 2019

9:18 a.m.

480 Alta Road

San Diego, California

REPORTED BY
Renee K. Papierniak
CSR No. 7056

```
 1     APPEARANCES:

 2

 3          For Plaintiffs:

 4               LAW OFFICE OF MARK E. MERIN
                 MARK E. MERIN
 5               1010 F Street, Suite 300
                 Sacramento, California  95814
 6               916.443.6911
                 mark@markmerin.com
 7

 8          For Defendants:

 9               ATTORNEY GENERAL OF CALIFORNIA
                 DEPUTY ATTORNEY GENERAL
10               CHRISTOPHER H. FINDLEY
                 600 West Broadway, Suite 1800
11               San Diego, California  92101
                 619.738.9541
12               christopher.findley@doj.ca.gov

13          Also Present:

14               Elijah Ochoa, videographer

15

16

17

18

19

20

21

22

23

24

25
```

Donnel Jones
June 10, 2019

```
1     INDEX TO EXAMINATION

2

3            WITNESS:  DONNEL JONES

4     EXAMINATION                                    PAGE

5     By Mr. Findley                                    6

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        INDEX TO EXHIBITS

2                          DONNEL JONES

3        RONNIE L. MOODY, et al. vs. CALIFORNIA DEPARTMENT OF

4                CORRECTIONS AND REHABILITATION, et al.

5                      Monday, June 10, 2019

6             Renee K. Papierniak, CSR No. 7056, RPR

7

8       MARKED                  DESCRIPTION                   PAGE

9       Exhibit 1   Inmate/Parolee Appeal                      57

10      Exhibit 2   Inmate/Parolee Appeal                      62

11      Exhibit 3   Government Claim Form                      68

12      Exhibit 4   Complaint For Violation Of Civil And       88
                    Constitutional Rights Demand For Jury
13                  Trial

14      Exhibit 5   Plaintiff Donnel E. Jones' Responses       89
                    To Defendant J. Duran's Interrogatories,
15                  Set One

16

17

18

19

20

21

22

23

24

25

Donnel Jones
June 10, 2019

```
 1              SAN DIEGO, CALIFORNIA;

 2           MONDAY, JUNE 10, 2019; 9:18 A.M.

 3

 4           THE VIDEOGRAPHER:  Good morning.  We are now on

 5    the record.  This is the recorded video deposition of

 6    Donnel Jones in the matter of Ronnie L. Moody, et al.

 7    versus California Department of Corrections and

 8    Rehabilitation, et al., taken on behalf of the

 9    defendants' counsel, Christopher Findley.

10           This deposition is taking place at 480 Alta

11    Road, San Diego, California 92179 on June 10th, 2019 at

12    9:18 a.m.

13           My name is Elijah Ochoa.  I'm the videographer

14    with U.S. Legal Support, located at 1230 Columbia Street,

15    Suite 400, San Diego, California 92101.

16           Video and audio recording will be taking place

17    unless all counsel have agreed to go off the record.

18           Would all present please identify themselves,

19    beginning with the witness.

20           THE WITNESS:  Donnel Jones.

21           MR. MERIN:  Mark Merin, plaintiffs' attorney.

22           MR. FINDLEY:  Chris Findley, defense attorney.

23           THE VIDEOGRAPHER:  The certified court reporter

24    is Renee Papierniak.  Would you now swear in the

25    witness.
```

Donnel Jones
June 10, 2019

```
 1                    DONNEL JONES,

 2        having been first duly sworn, was examined and

 3                  testified as follows:

 4

 5                      EXAMINATION

 6    BY MR. FINDLEY:

 7        Q.  Good morning, Mr. Jones.

 8        A.  Good morning.

 9        Q.  As we said off the record, my name is Chris

10    Findley.  I represent the defendants in the lawsuit

11    brought by you and your attorney, Moody versus CDCR, Case

12    No. 18-cv-1110.  Specifically, I represent CDCR, Warden

13    D. Paramo, D. Ramos, E. Cruz, J. (sic) Bravo, J. Duran,

14    J. McGee, J. Herrera, J. Salazar and W. Edrozo.

15            Have you had your deposition taken before?

16        A.  No.

17        Q.  Then I'll go over some of the ground rules for

18    the deposition so you understand them and so we have it

19    on the record.

20            Even though we're not in court, the court

21    reporter has placed you under oath and you're testifying

22    under penalty of perjury.  Do you understand that?

23        A.  Yes.

24        Q.  It's important that you understand my questions.

25    If you don't understand a question, ask me to rephrase
```

Darnell Jones
June 10, 2019

1    yard all the way until you were instructed to get up?

2         A.  Yes.

3         Q.  And do you know how many alarms there were on

4    the yard?

5         A.  No.

6         Q.  And I take it, you were out of your cell at the

7    time of the alarms?

8         A.  Yes.

9         Q.  And why were you out of your cell?

10        A.  For pill call.

11        Q.  How many inmates were out of their cell at that

12   time?

13        A.  Just a guess, maybe 10.

14        Q.  So I'm entitled to your best estimate based on

15   what you can observe.  And this is an instruction I

16   usually do at the beginning of the deposition.  But if

17   you have a basis -- so you were there, so you observed

18   it.  So you have a basis to estimate.  So you can give me

19   your best estimate.  But a lot -- if I asked you -- if

20   you don't have a basis to estimate, then that is a guess.

21   So if, for example, I asked you, "Well, how many inmates

22   were out on the yard at that time?"  You didn't see it so

23   that would be a guess.  So do you understand the

24   difference between an estimate and a guess?

25        A.  Yes.

June 10, 2019

```
1        Q.  You were in the housing unit and your best

2    estimate is there were about 10 inmates out?

3        A.  Yes.

4        Q.  And did you see an altercation between Inmate

5    Ronnie Moody and CC1 Fuerte?

6        A.  No.

7        Q.  You didn't see it at all?

8        A.  No.

9        Q.  Was -- are you aware there was a fight between

10   CC1 Fuerte and Inmate Moody?

11       A.  I heard movement.

12       Q.  Was it outside of your line of sight?

13       A.  Yes.

14       Q.  How far -- now, is there a window in which you

15   receive your medication?

16       A.  Yes.

17       Q.  And that's in the housing unit?

18       A.  Yes.

19       Q.  And were -- how close were you to the window?

20       A.  About five steps.

21       Q.  And could you see the counselor's office from

22   there?

23       A.  No.

24       Q.  And what did you hear?

25           THE REPORTER:  I'm sorry, "furniture moving"?
```

June 10, 2019

```
 1                THE WITNESS:  Furniture moving.

 2                THE REPORTER:  Thank you.

 3    BY MR. FINDLEY:

 4         Q.  Do you know what furniture was moving?

 5         A.  I can assume it probably was chairs and desks.

 6         Q.  Did you see any of the physical altercation

 7    between Moody and Fuerte?

 8         A.  No.

 9         Q.  Did you see -- do you know who CC1 Fuerte is?

10         A.  Yes.

11         Q.  Had you had any interactions with him before?

12         A.  No.

13         Q.  Was he assigned to your -- were you on his

14    caseload?

15         A.  I don't know who I was assigned to.

16         Q.  But did you know who Fuerte was?

17         A.  Yes.

18         Q.  And that was as of July 17th, 2017?

19         A.  Yes.

20         Q.  Did you see the officers pull Moody off CC1

21    Fuerte?

22         A.  No.

23         Q.  Did you see any of the officers hit or kick CC1

24    Fuerte -- excuse me.

25                Did you see any of the officers hit or kick
```

Donnell Jones
June 10, 2019

```
 1    housing unit?
 2         A.  I know Officer Herrera was in the control -- in
 3    the podium off control.
 4         Q.  Okay.  So I'm talking about the elevated control
 5    booth.
 6         A.  Officer Tapia.
 7         Q.  And that was on July 17th, 2017?
 8         A.  Yes.
 9         Q.  And then, do you know who the housing unit
10    officers were that day?
11         A.  I know one was Herrera.
12         Q.  Did you see Herrera leave the housing unit when
13    the alarm on the yard sounded?
14         A.  No.
15         Q.  Did you see any other officers leave the housing
16    unit when the alarm sounded?
17         A.  No.
18         Q.  Did the -- what did the -- what did Tapia do
19    during the incident with Moody?
20              MR. MERIN:  Object to the form of the
21    question.
22    BY MR. FINDLEY:
23         Q.  I'll rephrase.  When you heard the furniture
24    shuffling around, what did Tapia do?
25         A.  I heard the block gun shoot.
```

June 10, 2019

1          Q.  And how many times did Tapia shoot the block

2     gun?

3          A.  I'm not sure.  I just heard that one shot.

4          Q.  You just heard one shot.  Is that correct?

5          A.  That's all I heard.

6          Q.  Okay.  Did you see the -- where the block got

7     hit?

8          A.  No.

9          Q.  Did Tapia say anything before shooting the block

10    gun?

11         A.  No.

12         Q.  Did you see or hear officers come into the

13    building after Tapia shoots the block gun?

14         A.  Yes.

15         Q.  And did you -- were you -- could you see the

16    officers coming in through the sally port?

17         A.  No.

18         Q.  Where you were seated, could you see the sally

19    port?

20         A.  No.

21         Q.  And do you know what a sally port is?

22         A.  Yes.

23         Q.  Do you hear any inmates yelling when the

24    officers come into the building through the sally port?

25         A.  Yes.

Daniel Jones
June 10, 2019

1      Q.  And who did you hear yelling?

2      A.  Everyone.

3      Q.  Do you hear Inmate Williams yell anything?

4      A.  Yes.

5      Q.  And what does he yell?

6      A.  He yelled something like "What are you guys

7   doing?  Hey, I'm Inmate," and he said his CDC number,

8   "and if you need a witness on what they're doing, I'm in

9   cell" -- the cell -- he said his cell number.

10     Q.  Did you hear Williams yell anything else?

11     A.  No.

12     Q.  Just that.  He said, "Hey, what are you guys

13  doing?  I'm Inmate Williams in cell," whatever his cell

14  number is?

15     A.  Uh-huh.

16     Q.  Is that "yes"?

17     A.  Yes.

18     Q.  And did you hear him yell anything else?

19     A.  No.

20     Q.  And do you see the officers escort Moody out of

21  the building?

22     A.  No.

23     Q.  Do you see Moody again that day?

24     A.  Yes.

25     Q.  And when do you see Moody again?

Donnel Jones
June 10, 2019

```
 1          A.   Laying in the dirt on the side of the

 2     building.

 3          Q.   Outside of the housing unit?

 4          A.   Yes.

 5          Q.   When Moody was laying in the dirt outside of the

 6     building, did you see any injuries on him?

 7          A.   I thought he was dead.

 8          Q.   And why did you think he was dead?

 9          A.   He wasn't moving.

10          Q.   Did you see any injuries on Mr. Moody?

11          A.   I seen blood.

12          Q.   And where did you see blood?

13          A.   On his clothes, over his head and face.

14          Q.   And so you saw blood on his head and face.  Did

15     you see any wounds -- actual wounds on Mr. Moody?

16          A.   No.

17          Q.   And did you see -- when he was lying in the

18     dirt, do you see any officers use any force against

19     Mr. Moody?

20          A.   No.

21          Q.   All right.  At some point, does someone order

22     the inmates out on the dayroom floor back to their

23     cells?

24          A.   Yes.

25          Q.   And who does that?
```

Daniel Torres
June 10, 2019

```
 1        A.  Tapia.

 2        Q.  And what does Tapia say?

 3        A.  "Everyone recall.  Go back to your cell."

 4        Q.  And what do you do when that happens?

 5        A.  I stood up and began to walk to my cell.

 6        Q.  And what's your cell number?

 7        A.  106 lower.

 8        Q.  And do you walk directly back to your cell?

 9        A.  Yes.

10        Q.  So your path of travel was directly between

11   where you were seated and your cell door?

12        A.  Yes.

13        Q.  Now, were you -- did you have your cane with

14   you?

15        A.  No.

16        Q.  Were you wearing your mobility impaired vest?

17        A.  Yes.

18        Q.  Did you have any other durable medical equipment

19   with you when you were out of your cell on July 17th,

20   2017?

21        A.  No.

22        Q.  So no walker, no wheelchair?

23        A.  No.

24        Q.  Were you assigned a cane at that time?

25        A.  Yes.
```

Donnell Jones
June 10, 2019

```
 1    with HIV?

 2         A.  In '98.

 3         Q.  And you've been mobility impaired since that

 4    time?

 5         A.  About '99.

 6         Q.  But '99 is when the symptoms started?

 7         A.  Uh-huh.

 8         Q.  Is that correct?

 9         A.  Yes.

10         Q.  Okay.  You take a path back to your cell.  What

11    happens next?

12         A.  When I walk past the tunnel, I got attacked.

13         Q.  I guess I should ask you, do you -- I think you

14    testified you know who Deans was.  Right?

15         A.  Excuse me?

16         Q.  You know who Inmate Gary Deans was?

17         A.  Yes.

18         Q.  And did he get up at the same time as you?

19         A.  Yes.

20         Q.  And was he walking in front of you or behind

21    you?

22         A.  He was right across from me.

23         Q.  So he was next to you?

24         A.  About 10 feet away from me.

25         Q.  Deans was about 10 feet away?
```

```
 1          A.  Uh-huh.

 2          Q.  Is that correct?

 3          A.  Uh-huh.

 4          Q.  Can you say "yes"?

 5          A.  Yes.  Sorry.

 6          Q.  And do you see a physical altercation with

 7   Deans?

 8          A.  Yes.

 9          Q.  And what happens with Deans?

10          A.  I see him get punched and he fell.

11          Q.  And who punches him?

12          A.  Salazar.

13          Q.  Now, does Salazar run towards Deans and punch

14   him, or as Deans is walking by does Salazar turn around

15   and just hit him?

16              MR. MERIN:  Object to the form of the

17   question.

18   BY MR. FINDLEY:

19          Q.  Do you understand my question?

20          A.  Yes.

21          Q.  Describe what happened when Deans got hit by

22   Salazar?

23          A.  He walked over to him and punched him.

24          Q.  Salazar --

25          A.  Salazar.
```

1        Q.  -- walked towards Deans --

2        A.  And punched him.

3        Q.  How far -- how much ground did Salazar cover

4   before he punched Deans?

5        A.  I didn't understand that.

6        Q.  Sure.  Does -- is Salazar stationary and when

7   Deans walks by he punches him, or does Salazar run over

8   and hit Deans?

9            MR. MERIN:  Object to the form of the

10   question.

11           THE WITNESS:  Salazar walked over to him and hit

12   him.

13   BY MR. FINDLEY:

14       Q.  And how far did Salazar walk?

15       A.  I don't know, because when I turned around

16   that's when I see him take a couple of steps and hit

17   him.

18       Q.  So a couple of steps?

19       A.  Uh-huh.

20       Q.  Is that correct?

21       A.  Uh-huh.

22       Q.  Is that "yes"?

23       A.  Yes.

24       Q.  All right.  So Salazar -- you see Salazar take a

25   couple of steps and hit Deans?

```
 1        A.  Yes.

 2        Q.  And do you see Deans hit Salazar?

 3        A.  No.

 4        Q.  Did you see anything before Salazar hit Deans?

 5        A.  No.

 6        Q.  But you saw Salazar take a couple of steps and

 7    then hit Deans?

 8        A.  Yes.

 9        Q.  And what happens to Deans?

10        A.  He falls down.

11        Q.  Do you see any injuries to Deans?

12        A.  No.

13        Q.  Do you see any injuries to Salazar?

14        A.  No.

15        Q.  And what happens after Deans falls down?

16        A.  I tried to get as far away as I could.  So I'm

17    walking past Deans, the -- the sally port, and that's

18    when I get attacked.

19        Q.  So when you say you tried to get as far away as

20    you could, do you change directions?

21        A.  No.  I was just walking towards my cell.

22        Q.  So you're walking towards your cell?

23        A.  Uh-huh.

24        Q.  You see Salazar hit Deans?

25        A.  Yes.
```

June 10, 2019

```
1          Q.  And Deans goes down?

2          A.  Yes.

3          Q.  And you just keep walking?

4          A.  Yes.

5          Q.  What happens next?

6          A.  When I get about a step past the sally port, my

7     hair was grabbed and I was -- my forehead was snapped on

8     the ground and I got attacked.

9          Q.  You say your hair was grabbed?

10         A.  Uh-huh.

11         Q.  Is that correct?

12         A.  Yes.

13         Q.  Did you have longer hair then?

14         A.  Yes.

15         Q.  And were you grabbed from behind?

16         A.  Yes.

17         Q.  Did you see who grabbed you?

18         A.  No.

19         Q.  Do you know now who grabbed you?

20         A.  No.

21         Q.  And had you kept walking after Deans got hit?

22         A.  Yes.

23         Q.  And someone grabs you from behind and then slams

24    your head down?

25         A.  Yes.
```

June 10, 2019

```
 1          Q.  And do you lose consciousness?

 2          A.  No.

 3          Q.  And what happens next?

 4          A.  Officer Cruz grabs my left arm and put it behind

 5     me and then he grabs my right arm and twisted it up to

 6     the back of my head until my arm pops.

 7          Q.  And your arm pops.  And describe what you mean

 8     by "pops"?

 9          A.  I heard it snap.

10          Q.  And does Cruz -- describe how you know it was

11     Cruz that twisted your arm?

12          A.  Because when he got on top of me his words was,

13     "Stay still mother fucker.  Stay still."  And I looked

14     around and I told him that he's breaking my arm.

15          Q.  So someone knocks you down.  Correct?

16          A.  Well, it was -- it was almost like a military

17     tactic.  They ran in and -- it was more than one person.

18     But one person grabbed my hair and I was attacked and

19     brought down with my head slammed on the concrete.

20              And Cruz got on my back and one person had their

21     knee on the side of my face.  And that's when I seen

22     Cruz, and I told him that he was breaking my arm.

23          Q.  And Cruz says, "Stay still mother fucker.  Stay

24     still"?

25          A.  Yes.
```

June 10, 2019

1      Q.  Does Cruz say anything else?

2      A.  No.

3      Q.  Do you hear any other officers say anything

4   else?

5      A.  I heard a lot of commotion.

6      Q.  Do you hear officers say anything else to you?

7      A.  No.

8      Q.  So the only thing you heard was "Stay still

9   mother fucker.  Stay still"?

10     A.  Yes.

11     Q.  And do you remember Cruz or any other officer

12  saying anything else to you?

13     A.  No.

14     Q.  Do -- what arm did you hear pop?

15     A.  My right arm.

16     Q.  Which arm do you write with?

17     A.  My right arm.

18     Q.  And does someone place you in handcuffs?

19     A.  Yes.

20     Q.  And do you know who that was?

21     A.  Cruz.

22     Q.  Does anyone punch you?

23     A.  No.

24     Q.  Does anyone kick you?

25     A.  No.

June 10, 2019

1    and escort you out?

2        A.  Everything happened altogether in about five

3    minutes.

4        Q.  So after they take you down, put you in

5    handcuffs, you're on the ground for five minutes before

6    they pick you up and take you out?

7        A.  Yes.

8        Q.  And who picks you up?

9        A.  Officer Cruz.

10       Q.  And describe how he picked you up?

11       A.  He grabbed my right arm in between, from the

12   back, and another officer, on the other side, lift me up

13   to my feet.

14       Q.  Did you sustain any injuries as a result of

15   being lifted off your feet?

16       A.  No.

17       Q.  And then, who actually physically walks you out

18   of the building?

19       A.  Officer Valencia.

20       Q.  And where does Officer Valencia take you?

21       A.  To the gym.

22       Q.  And are you put in a holding cell in the gym?

23       A.  Yes, a cage.

24       Q.  And how long are you in a cage in the gym?

25       A.  About an hour.

Daniel Torres
June 10, 2019

```
 1        Q.  And where do you go next?

 2        A.  To an ambulance, rushed out to Tri-Medical

 3   Medical Facility.

 4        Q.  So you're in a cage about an hour, and then, do

 5   you go to TTA?

 6        A.  Yes.

 7        Q.  And do you know what "TTA" is?

 8        A.  Yes.

 9        Q.  Like the prison hospital?

10        A.  Yes.

11        Q.  All right.  And how long are you at TTA?

12        A.  I went to the ambulance and went out to a

13   hospital.

14        Q.  Did they examine you at TTA before you go to the

15   hospital?

16        A.  They examined me in the cage.  The nurses

17   examined me in a cage.

18        Q.  Do you remember what you told the nurse when

19   they examined you in the cage?

20        A.  They have this paper with a body form on it and

21   they take a visual eye where the injuries at and they

22   circle what the injuries are.  And they circled where the

23   injuries were on my forehead and on my elbow, and they

24   asked me if I had any comments.  And I said "No comment,"

25   because of other officers that were involved.
```

June 10, 2019

1          Q.  Do you remember telling -- was the form that

2    they fill out with the body on it, was that -- do you

3    know if that's a CDCR Form 7219?

4          A.  Yes.

5          Q.  And do you remember telling the nurse "My arm

6    got twisted when I got put in restraints"?

7          A.  No.

8          Q.  You didn't say that?

9          A.  No.

10         Q.  You just said "No comment"?

11         A.  "No comment."

12         Q.  In describing your injuries you mentioned you

13    injured your right elbow.  What happened to your right

14    elbow?

15         A.  I think it got snapped out of place.

16         Q.  It got dislocated?

17         A.  Yes.

18         Q.  Any other injuries to your right elbow?

19         A.  No.

20         Q.  Did you break your arm as a result of the

21    incident on July 17th, 2017?

22              MR. MERIN:  Object to the form of the

23    question.

24    BY MR. FINDLEY:

25         Q.  You can answer.

Donnell Tolle's
June 10, 2019

```
1          A.  Yes.
2          Q.  And are you seen by a doctor when you returned
3    to Donovan?
4          A.  No.
5          Q.  Were you seen by a doctor on July 18th, 2017,
6    the next day?
7          A.  Yes.
8          Q.  Do you remember the doctor's name?
9          A.  No.
10         Q.  Was it Forrester?
11         A.  I don't remember his name.
12         Q.  And what did the doctor tell you on July 18th,
13   2017?
14         A.  He wrapped my arm up and and send me back to the
15   cell.
16         Q.  Now, did you receive a split at Tri-City Medical
17   Center?
18         A.  Yes.
19         Q.  And describe the split?  What did it look
20   like?
21         A.  It was a -- half of a molded cast and with a
22   bandaged wrapped around it.  And --
23         Q.  I'm sorry.  Go ahead.
24         A.  And an arm -- that you put your arm in for
25   support.
```

1        Q.  A sling?

2        A.  Yes.

3        Q.  And does Tri-City Medical Center prescribe you

4    any medicine?

5        A.  Yes.

6        Q.  And what's that?

7        A.  I don't know what it was, but they said they

8    didn't prescribe any narcotics.  But I don't use

9    narcotics.  But it was something for pain.

10        Q.  Was it Motrin?

11        A.  Yes.

12        Q.  Other than Motrin, did Tri-City Medical Center

13    prescribe any other medications for your elbow?

14        A.  No.

15        Q.  After you were seen on July 18th, 2017, are you

16    seen again on July 24th, 2017?

17        A.  Yes.

18        Q.  And do you remember who you saw on July 24th,

19    2017?

20        A.  No.

21        Q.  And had you been wearing your split since the

22    incident on July 17th, 2017?

23        A.  Yes.

24        Q.  And how long did you wear the splint?

25        A.  For about a couple of months.

June 10, 2019

```
 1          Q.  And when did you get out of ad seg?

 2          A.  I'd say around December -- in between December

 3     and January.

 4          Q.  2017 -- December 2017, January 2018?

 5          A.  Yeah.

 6          Q.  Did you ever receive any treatment for the

 7     injury to your forehead?

 8          A.  Just Motrin.

 9          Q.  Any other treatment for the injury to your

10     forehead other than Motrin?

11          A.  No.  I filed a medical 602 because I had

12     blurriness in my -- my left eye.  And so I'm still

13     waiting on a response for that.

14          Q.  When did you file a medical 602 for blurriness

15     in your left eye?

16          A.  When I was in ad seg.

17          Q.  That was in 2017?

18          A.  Yes.

19          Q.  And had you previously had blurriness in your

20     left eye?

21          A.  No.

22          Q.  Any other injuries or symptoms from the injury

23     to your forehead?

24          A.  No.

25          Q.  What about contact with the defendants after
```

Donnell Cortez

June 10, 2019

```
 1      July 17th, 2017?  Did you ever speak to Warden Paramo
 2      about the incident on July 17th -- after July 17th,
 3      2017?
 4           A.  Yes.
 5           Q.  And when did that happen?
 6           A.  When I went to committee.
 7           Q.  And this was your classification committee?
 8           A.  Uh-huh.
 9           Q.  Is that "yes"?
10           A.  Yes.
11           Q.  And when did that happen?
12           A.  Once I was getting released from ad seg.
13           Q.  So it wasn't an annual review, it was to be
14      released from ad seg?
15           A.  Yes.
16           Q.  And what do you remember Warden Paramo doing --
17      saying during the classification committee?
18           A.  Well, I didn't want to come back to the yard and
19      he said that "All the officers that were involved are not
20      there any more and the officers don't do anything that
21      you're saying that they're doing."
22           Q.  Did Warden Paramo say anything else to you
23      regarding the incident?
24           A.  He said that he would try to investigate the
25      situation.
```

Donnell Jones
June 10, 2019

1      Q.  Did you say anything to Warden Paramo about the
2   incident?
3      A.  No.
4      Q.  What did you say to Warden Paramo during the
5   committee hearing?
6      A.  I was trying to go to another yard.  And he said
7   that it was a privileged yard and I'm -- and I'm not a
8   privileged inmate to go to the yard.
9      Q.  Did you ask to go to echo yard?
10      A.  No.  I'd asked at the time to go to A yard.
11      Q.  When was your classification committee?
12      A.  I -- I don't -- I'm not good with dates.
13      Q.  Okay.  But was it whenever you got released from
14   administrative segregation?
15      A.  Yeah.
16      Q.  What else did Warden Paramo say during the
17   classification hearing?
18      A.  Well, I -- I asked him -- because I didn't
19   understand -- because of my 602 that I had filed, he
20   partially granted it.  So I was -- I asked him, "So does
21   that mean that I'm not guilty for what they say?"  And he
22   said, "Well, we just partially granted it," because they
23   didn't allow a staff assault to even be referred to the
24   DA.  They said, "No, we'll handle it inside."
25          So then I asked him, "Well, I would" -- I asked

1   him for a polygraph test and for the officers to have a

2   polygraph test.  And he said that they don't do things

3   like that in here.

4          Q.  And what did you say back to Warden Paramo?

5          A.  Nothing.

6          Q.  All right.  Do you remember anything else Warden

7   Paramo said at your committee hearing after you were

8   released from ad seg?

9          A.  No.

10         Q.  Did Warden Paramo say anything about the

11  incident during the classification hearing other than

12  what you've testified to?

13         A.  No.

14         Q.  Did you have any other conversations with Warden

15  Paramo after July 17th, 2017?

16         A.  No.

17         Q.  What about D. Ramos, did you have any

18  conversations with D. Ramos after July 17th, 2017?

19         A.  No.

20         Q.  E. Cruz, did you talk to E. Cruz after July

21  17th, 2017?

22         A.  I seen him every day but I never said anything

23  to him.

24         Q.  Has Cruz said anything to you since July 17th,

25  2017?

Donnell Jones
June 10, 2019

1        Q.  Did you file a 602, prison appeal, regarding the

2   incident?

3        A.  Yes.

4            (Exhibit No. 1 marked.)

5   BY MR. FINDLEY:

6        Q.  Mr. Jones, I'm going to show you a document

7   we're going to mark as Exhibit 1.

8        A.  All right.

9        Q.  Exhibit 1 is a multi-page document Bates labeled

10  AGO 15348 through AGO 15351, entitled Inmate/Parolee

11  Appeal, CDCR 602, dated August 7th, 2017.

12           Mr. Jones, do you recognize Exhibit 1?

13       A.  Yes.

14       Q.  And is that your signature under

15  Inmate/Parolee's signature?

16       A.  Yes.

17       Q.  And did you sign that on August 7th, 2017?

18       A.  Yes.

19       Q.  And is that your handwriting under boxes A and B

20  on the first page?

21       A.  Yes.

22       Q.  And if you go to the third page, is it that your

23  handwriting under paragraphs A and B?

24       A.  Yes.

25       Q.  And at the bottom of the third page of Exhibit

Donnell Jones
June 10, 2019

```
 1    1, is that your signature?

 2         A.  Yes.

 3         Q.  And did you sign that on August 7th, 2017?

 4         A.  Yes.

 5         Q.  Did anyone assist you with writing the appeal?

 6         A.  No.

 7         Q.  Did you talk to Inmate Williams before you

 8    drafted the appeal?

 9         A.  No.

10         Q.  Why did you wait until August 7th, 2017 to write

11    the appeal?

12         A.  Because I didn't -- I was confused about what

13    had happened and I wasn't even coming out or nothing.  I

14    was messed up in the head.

15         Q.  So the reason you waited until August 17th

16    (sic), 2017 because you were confused about what

17    happened?

18         A.  Yeah.

19         Q.  Had you talked to any officers about what

20    happened on July 17th, 2017, before you filed your

21    appeal?

22         A.  No.

23         Q.  Had you talked to any medical or mental health

24    staff about what happened before August 7th, 2017?

25         A.  Yes.
```

```
 1        Q.  Pain medication for your elbow?

 2        A.  Uh-huh.  specifically, a non-narcotic

 3   medication.

 4        Q.  And did you get a response to the medical 602?

 5        A.  Yes.

 6        Q.  And what was the response?

 7        A.  I think I got seen by a doctor and they -- I was

 8   already on Gabapentin, but they just upped the doses of

 9   Gabapentin.  And so, you know, I -- I signed off on it.

10        Q.  All right.  Did you appeal the medical appeal

11   through the third level of appeal, or did you just accept

12   the increased dosage?

13        A.  I accepted the increased dosage.

14        Q.  Other than that medical appeal and Exhibits 1

15   and 2, did you file any other appeals related to the

16   incident on July 17th, 2017?

17        A.  Not that I can remember.

18        Q.  Not that you recall?

19        A.  No.

20        Q.  Going back to Exhibit 1, the appeal you filed on

21   August 7th, 2017.  Did you receive a response to that

22   appeal?

23        A.  Yes.

24        Q.  And was that -- is that the one that was

25   partially granted?
```

June 10, 2019

```
 1         A.  Yes.

 2         Q.  And did you appeal Exhibit 1 through the third

 3    level of appeal?

 4         A.  Yes.

 5         Q.  Do you remember if Exhibit 1 was ever screened

 6    out or canceled?

 7         A.  Yes.

 8         Q.  And when did that happen?

 9         A.  After I got out of ad seg.

10         Q.  And was that at -- was that at RJD?

11         A.  Yes.

12         Q.  And was it -- was Exhibit 1 subsequently

13    accepted for review?

14         A.  It was sent to the third level and they kept

15    sending it back and wanting -- and kept prolonging it and

16    prolonging it.

17         Q.  So the third level of appeal kept sending the

18    appeal back?

19         A.  Yes.

20         Q.  And do you know if the third level of appeal

21    ever accepted the -- Exhibit 1 for review?

22         A.  I don't know if I understand that or not.  The

23    only thing I know is after the third level, they -- they

24    exhausted all my -- all my -- they exhausted the 602.

25         Q.  Did you -- so did you get a decision from the
```

Donnell Jones
June 10, 2019

```
 1      third level appeal on Exhibit 1 denying the appeal?
 2           A.  Yes.
 3           Q.  What about Exhibit 2, did you exhaust that to
 4      the third level of appeal?
 5           A.  Yes.
 6           Q.  Other than the medical appeal and Exhibits 1 and
 7      2, did you file any other appeals related to the incident
 8      on July 17th, 2017?
 9           A.  I filed an appeal of the guilty finding.
10           Q.  And that's Exhibit 2.  Right?
11           A.  Yeah.
12           Q.  So other than Exhibits 1, 2 and the medical
13      appeal to increase your pain medication, did you file any
14      prison appeals related to the incidents on July 17th,
15      2017?
16           A.  No.
17           Q.  Did you ever file an appeal against Warden
18      Paramo regarding the incident on July 17th, 2017?
19           A.  I mentioned him.
20           Q.  In which one?
21           A.  No.  No, I didn't mention him in my 602.
22           Q.  Okay.  Just so we have it for the record, did
23      you file an appeal against former Warden Paramo regarding
24      the incident on July 17th, 2017?
25           A.  No.
```

```
 1                    REPORTER'S CERTIFICATE

 2

 3            I, RENEE K. PAPIERNIAK, a Certified Shorthand

 4    Reporter, do hereby certify:

 5            That the foregoing proceedings were taken

 6    before me at the time and place therein set forth,

 7    At which time the witness was put under oath by me;

 8            That the testimony of the witness, the

 9    questions propounded, and all objections and statements

10    made at the time of the examination were recorded

11    stenographically by me and were thereafter transcribed;

12            That a review of the transcript by the deponent

13    was requested:

14            That the foregoing is a true and correct

15    transcript of my shorthand notes so taken.

16            I further certify that I am not a relative or

17    employee of any attorney of the parties, nor financially

18    interested in the action.

19            I declare under penalty of perjury under the

20    laws of California that the foregoing is true and

21    correct.

22            Dated this 20th day of June, 2019.

23    _Renee K. Papierniak_

24    _____
              RENEE K. PAPIERNIAK, CSR NO. 7056

25
```